**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

| Chief Justice: | Justices: |
| --- | --- |
| Clifford W. Taylor | Michael F. Cavanagh |
| | Elizabeth A. Weaver |
| | Marilyn Kelly |
| | Maura D. Corrigan |
| | Robert P. Young, Jr. |
| | Stephen J. Markman |

FILED MAY 31, 2006

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant,

v                                       No.126379

KEVIN M. ROBINSON,

    Defendant-Appellee.

_____

BEFORE THE ENTIRE BENCH

YOUNG, J.

Defendant and a codefendant, Samuel Pannell, committed an aggravated assault, and Pannell shot and killed the victim, Bernard Thomas. After a bench trial, the trial court convicted defendant of second-degree murder under an aiding and abetting theory. The Court of Appeals reversed the trial court's judgment, because it concluded that there was insufficient evidence that defendant shared or was aware of Pannell's intent to kill.

We hold that under Michigan law, a defendant who intends to aid, abet, counsel, or procure the commission of *a* crime, is liable for that crime as well as the natural and probable consequences of that crime. In this case, defendant

committed and aided the commission of an aggravated assault. One of the natural and probable consequences of such a crime is death. Therefore, the trial court properly convicted defendant of second-degree murder. We reverse the judgment of the Court of Appeals and reinstate defendant's conviction of second-degree murder.

FACTS AND PROCEDURAL HISTORY

According to the evidence adduced at trial, defendant and Pannell went to the house of the victim, Bernard Thomas, with the stated intent to "f*** him up." Under Pannell's direction, defendant drove himself and Pannell to the victim's house. Pannell knocked on the victim's door. When the victim opened the door, defendant struck him. As the victim fell to the ground, defendant struck the victim again. Pannell began to kick the victim. Defendant told Pannell that "that was enough," and walked back to the car. When defendant reached his car, he heard a single gunshot.[1]

Following a bench trial, the trial court found defendant guilty of second-degree murder "on the prong of great bodily harm only."[2] Specifically, the court found that defendant drove Pannell to the victim's house with the intent to physically attack the victim. The court also found that once at the victim's home,

_____

[1] The parties stipulated that the victim died from a gunshot wound. Defendant stated that he did not shoot the victim and that only he, Pannell, and the victim were at the victim's house.

[2] A jury convicted Pannell of first-degree murder.

2

defendant initiated the attack on the victim, and that defendant's attack enabled Pannell to "get the upper-hand" on the victim. The court sentenced defendant to a term of 71 months to 15 years.

The Court of Appeals reversed defendant's murder conviction, holding that there was insufficient evidence to support defendant's second-degree murder conviction.[3] The Court held that the trial court improperly convicted defendant of second-degree murder because there was no evidence establishing that defendant was aware of or shared Pannell's intent to kill the victim.

This Court granted the prosecution's application for leave to appeal, directing the parties to address the elements of accomplice liability and the *mens rea* required to support a conviction of aiding and abetting second-degree murder.[4]

## STANDARD OF REVIEW

The requirements of the aiding and abetting statute[5] are a question of law that this Court reviews de novo.[6] "[W]ords and phrases that have acquired a unique meaning at common law are interpreted as having the same meaning when

---

[3] Unpublished opinion per curiam of the Court of Appeals, issued April 29, 2004 (Docket No. 237036).

[4] 472 Mich 898 (2005).

[5] MCL 767.39.

[6] *People v Schaefer*, 473 Mich 418, 427; 703 NW2d 774 (2005).

3

used in statutes dealing with the same subject."[7]  In evaluating defendant's claim regarding the sufficiency of the evidence, this Court reviews the evidence in a light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt.[8] Findings of fact by the trial court may not be set aside unless they are clearly erroneous.[9]

## ANALYSIS

This case involves liability under our aiding and abetting statute, MCL 767.39, which provides:

> Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense.

Unlike conspiracy[10] and felony murder,[11] which also allow the state to punish a person for the acts of another, aiding and abetting is not a separate

---

[7] *Pulver v Dundee Cement Co*, 445 Mich 68, 75;  515 NW2d 728 (1994).

[8] *People v Hardiman*, 466 Mich 417, 421; 646 NW2d 158 (2002).

[9] MCR 2.613(C).

[10] MCL 750.157a.

[11] MCL 750.316(1)(b).

substantive offense. Rather, "being an aider and abettor is simply a theory of prosecution"[12] that permits the imposition of vicarious liability for accomplices.

This Court recently described the three elements necessary for a conviction under an aiding and abetting theory:

> "(1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement."[13]

The primary dispute in this case involves the third element. Under the Court of Appeals analysis, the third element would require the prosecutor to prove beyond a reasonable doubt that a defendant intended to commit the identical offense, here homicide, as the accomplice or, alternatively, that a defendant knew that the accomplice intended to commit the homicide. We reaffirm that evidence of defendant's specific intent to commit a crime or knowledge of the accomplice's intent constitutes sufficient *mens rea* to convict under our aiding and abetting statute. However, as will be discussed later in this opinion, we disagree that evidence of a shared specific intent to commit the crime of an accomplice is the exclusive way to establish liability under our aiding and abetting statute.

---

[12] *People v Perry*, 460 Mich 55, 63 n 20; 594 NW2d 477 (1999).

[13] *People v Moore*, 470 Mich 56, 67-68; 679 NW2d 41 (2004), quoting *People v Carines*, 460 Mich 750, 768; 597 NW2d 130 (1999) (change in *Moore*).

5

## AIDING AND ABETTING STATUTE

The theory that a defendant could be liable for another's criminal actions as an "aider and abettor" goes back to the common law. At common law, there were four categories of offenders to a felony:

> (1) principal in the first degree–he actually engaged in the felonious conduct; (2) principal in the second degree–he was present when the felony was committed and aid and abetted its commission; (3) accessory before the fact–he was not present when the felony was committed but aided and abetted prior to its commission; (4) accessory after the fact–he was not present when the felony was committed but rendered aid thereafter in order to protect the felon or to facilitate his escape.[14]

Principals in the second degree had to intend to commit the crime charged or else be aware of the intent of the principal in the first degree to commit that crime.[15] But accessories before the fact were "guilty of all incidental consequences which might reasonably be expected to result from the intended wrong."[16] Thus, at common law, one could be guilty of the natural and probable consequences of the intended crime or the intended crime itself, depending on whether the actor was a principal in the second degree or an "accessory before the fact." Michigan's aiding and abetting statute has been in force and substantively

---

[14] Wharton's Criminal Law (15th ed), p 181.

[15] Perkins, Criminal Law (3d ed), pp 741-743.

[16] *Id.* at 745.

6

unchanged since the mid-1800s.[17]  The 1855 statute, 1855 PA 77, § 19, which is

nearly identical to the current statute, stated:

> The distinction between an accessory before the fact, and a
> principal, and between principals in the first and second degree in
> cases of felony, is abrogated; and all persons concerned in the
> commission of a felony, whether they directly commit the act
> constituting the offence, or aid and abet in its commission, though
> not present, may hereafter be indicted, tried and punished, as
> principals, as in the case of a misdemeanor.[18]

When a statute employs general common-law terms, courts will interpret

the statute by looking to common-law definitions, absent clear legislative intent to

change the common law.[19]  As this Court has previously indicated, the aiding and

abetting statute was a legislative abolition of the common-law distinctions

between principals and accessories.[20]  Beyond that, there has been little case law

---

[17] In 1927, the Legislature amended the language to its present form, which substitutes "procures, counsels, aids, or abets" for "aid and abet."  This change did not affect the meaning of the statute because the common law definition of "aid and abet" is to "[h]elp, assist, or facilitate the commission of a crime, promote the accomplishment thereof, help in advancing or bringing it about, or encourage, counsel, or incite as to its commission."  Black's Law Dictionary (5th ed), p 63.  The Legislature merely added terms that were synonymous with the common-law definition of "aid and abet."

[18] See also 1857 CL 6065 (same); 1897 CL 11930 (same); 1915 CL 15757 (changing "c" to "s" in "offence"); 1927 PA 175, ch VII, § 39 (same as MCL 767.39); 1929 CL 17253 (same); 1948 CL 767.39 (same); and 1970 CL 767.39 (same).

[19] *People v Riddle*, 467 Mich 116, 125-26; 649 NW2d 30 (2002).

[20] *People v Palmer*, 392 Mich 370, 378; 220 NW2d 393 (1973).

from this Court interpreting *the language* of this statute.[21]  However, we note that there is no language in the statute that demonstrates a legislative intent to abrogate the common-law theory that a defendant can be held criminally liable as an accomplice if: (1) the defendant intends or is aware that the principal is going to commit a specific criminal act;[22] or (2) the criminal act committed by the principal is an "incidental consequence[] which might reasonably be expected to result from the intended wrong." [23]

Accordingly, we hold that when the Legislature abolished the distinction between principals and accessories, it intended for all offenders to be convicted of the intended offense, in this case aggravated assault, as well as the natural and probable consequences of that offense, in this case death.  The case law that has developed since the Legislature codified these common-law principles provides examples of accomplice liability under both theories.

---

[21] As will be discussed later in this opinion, there have been numerous cases discussing aiding and abetting liability, but none of those cases focused on the language of the statute.

[22] Perkins, Criminal Law (3d ed), pp 741-743

[23] *Id.* at 745.  Justice Kelly misapprehends our holding as "improperly extend[ing] the reach of Michigan's aiding and abetting statute, MCL 767.39." *Post* at 1.  When the Legislature first codified the aiding and abetting statute in 1855, it reflected an express intent to abrogate the common-law distinction between principals and accessories.  However, in all other regards, the Legislature did *not* utilize language reflecting an intent to abrogate the common-law theories under which an accessory can be held criminally liable for the acts of a principal.  One such theory of liability is predicated on the "natural and probable consequences" of a planned criminal act.  Perkins, *supra*.

8

## NATURAL AND PROBABLE CONSEQUENCES

Under the natural and probable consequences theory, "[t]here can be no criminal responsibility for any thing not fairly within the common enterprise, and which might be expected to happen if the occasion should arise for any one to do it."[24] In *Knapp*, the defendant and several other men engaged in sexual intercourse with the victim. After the defendant left, one of the men threw the woman from a second-story window. A jury convicted the defendant of manslaughter. This Court reasoned that because there was no evidence that the defendant threw the victim out the window, the jury must have held him accountable for the actions of the other men.

The *Knapp* Court reversed the defendant's conviction for manslaughter because there was no proof that the woman's death was a part of the "common enterprise" of prostitution because one would not expect it "to happen if the occasion should arise to do it."[25] Therefore, the defendant could not be held to be an accomplice to the manslaughter.

Similarly, in *People v Chapman*, this Court held that a defendant was "'responsible criminally for what of wrong flows directly from his corrupt

---

[24] *People v Knapp*, 26 Mich 112, 114 (1872).

[25] *Id.* at 115. See also *People v Foley*, 59 Mich 553, 556; 26 NW2d 699 (1886) (Defendants, who brutally assaulted the victim, "should nevertheless not be convicted of robbery unless robbery was *within their common purpose*.") (emphasis added).

intentions . . . .'"[26] *Chapman* involved a defendant who paid another man $25 to commit adultery with the defendant's wife so the defendant could divorce her. The defendant watched through a hole in the wall as the other man raped his wife. This Court held that the jury properly convicted the defendant of rape under an accomplice theory of liability because that crime directly flowed from the original corrupt intention to aid adultery.[27]

In view of the framework established by these early cases, the propriety of the trial court's verdict is clear. The victim's death is clearly within the common enterprise the defendant aided because a homicide "might be expected to happen if the occasion should arise" within the common enterprise of committing an aggravated assault. The evidence establishes that the victim threatened his children in Pannell's presence, enraging Pannell.[28] When defendant woke up at 10:00 that evening, Pannell was still "ranting and raving" in the house. Despite knowing that Pannell was in an agitated state, defendant agreed to drive to the

---

[26] 62 Mich 280, 286; 28 NW 896 (1886) (quoting 1 Bishop, Criminal Law, § 641).

[27] However, this Court ultimately overturned his conviction on other grounds because the preliminary examination testimony did not meet statutory requirements.

[28] Prosecution witness Brandi Brewer, defendant's fiancé, testified that the victim "told his wife he was going to beat the kids ass, and do something to her . . . ."

10

victim's house with the understanding that he and Pannell would "f*** him up."[29]

When the pair arrived at the victim's home, defendant initiated the assault by hitting the victim once in the face and once in the neck with the back of his hand. After the victim fell to the ground, Pannell punched him twice and began kicking him. In our judgment, a natural and probable consequence of a plan to assault someone is that one of the actors may well escalate the assault into a murder. Just as the planned seduction of the defendant's wife in *Chapman* escalated into a rape,[30] Pannell's anger toward the victim escalated during the assault into a

---

[29] Justice Kelly argues that "[a]s a practical matter, f***ing up someone necessarily entails leaving them alive." *Post* at 7. However, literally in the next breath, she includes in the definition of "f***": "'[t]o break or destroy.'" *Id.* at 7 n 7, quoting <http://en.wiktionary.org/wiki/f***> (accessed April 19, 2006). We note that the word "destroy" is also defined as "2. to put an end to, extinguish; 3. *to kill; slay*." *Random House Webster's College Dictionary* (1997) (emphasis added). Thus, Justice Kelly's own definition belies her statement that the word cannot, in any context, be used to mean actions that are likely to result in a killing.

[30] Justice Kelly notes that *Chapman* defined an accomplice's liability as follows:"'"If one person sets in motion the physical power of another, the former is criminally responsible for its results. If he contemplated the result, he is answerable, *though it is produced in a manner he did not contemplate*."'" *Post* at 8, quoting *Chapman, supra* at 286 (citations omitted) (emphasis added).

Justice Kelly argues that because defendant never contemplated Pannell's shooting the victim, he cannot be held answerable under the law for that shooting. We disagree. Here, defendant set into motion the violent physical assault of the victim perpetrated by himself and Pannell. The evidence clearly demonstrates that defendant "contemplated" causing great bodily harm to the victim. One of the potential consequences of causing great bodily harm is that the ultimate result could be the death of the victim. That the death in this case was produced by Pannell's shooting of the victim rather than because of beating injuries sustained by the victim does not absolve defendant from his criminal responsibility.

11

murderous rage.  Defendant argues that he should not be held liable for the murder because he left the scene of the assault after telling Pannell, "That's enough."  We disagree.  Defendant was aware that Pannell was angry with the victim even before the assault.  Defendant escalated the situation by driving Pannell to the victim's house, agreeing to join Pannell in assaulting the victim, and initiating the attack.  He did nothing to protect Thomas and he did nothing to defuse the situation in which Thomas was ultimately killed by Pannell.  A "natural and probable consequence" of leaving the enraged Pannell alone with the victim is that Pannell would ultimately murder the victim.  That defendant serendipitously left the scene of the crime moments before Thomas's murder does not under these circumstances exonerate him from responsibility for the crime.

The fact that Pannell shot the victim, rather than beat him to death, does not alter this conclusion.  It cannot be that a defendant can initiate an assault, leave an already infuriated principal alone with the victim, and then escape liability for the murder of that victim simply because the principal shot the victim to death, instead of kicking the victim to death.  Like the defendant in *Chapman*, whose accomplice used rape, as opposed to seduction, to accomplish their common criminal purpose, the defendant is criminally liable as long as the crime is within the natural and probable consequences of the intended assaultive crime.

INTENDED OFFENSES

The Court of Appeals panel in this case focused on cases that reflect the intended offenses theory, such as *People v Kelly*[31] to hold that an aider or abettor must have the identical criminal intent as the principal.[32] *Kelly* involved a murder that occurred during the course of an armed robbery. The jury convicted the defendant as either a principal or an aider and abettor of the felony murder. The *Kelly* Court affirmed his conviction. In analyzing the aiding and abetting charge, this Court cited *Meister v People*[33] for the proposition that "[t]he requisite intent is that necessary to be convicted of the crime as a principal."[34]

Under *Kelly*, a defendant is liable for the offense the defendant intended to commit or intended to aid and abet. However, the Court of Appeals panel in this case went further than *Kelly*, and required the accomplice to have the identical intent as the principal.[35] This narrow construction is not compelled by *Kelly*.

---

[31] 423 Mich 261; 378 NW2d 365 (1985).

[32] The Court of Appeals panel also relied on *People v Barrera*, 451 Mich 261, 294; 547 NW2d 280 (1996), but in that case this Court merely quoted from *Kelly* without any additional analysis. Further, the discussion of *Kelly* was in response to the dissent in *Barrera*, not part of the substantive analysis of the opinion that dealt with MRE 804(b)(3).

[33] 31 Mich 99 (1875).

[34] *Kelly, supra* at 278.

[35] This Court has recently repudiated the notion that conviction under an aiding and abetting theory can require a higher level of intent than would be
(continued...)

13

*Kelly* addressed aiding and abetting felony murder. Under *People v Aaron*, to sustain a felony murder conviction, the prosecution must prove that each defendant had the necessary malice to be convicted of murder.[36] *Aaron* makes clear that one who aids and abets a felony murder must have the requisite malice to be convicted of felony murder, but need not have the same malice as the principal. This principle extends to other crimes: sharing the same intent as the principal allows for accomplice liability. However, sharing the identical intent is not a *prerequisite* to the imposition of accomplice liability under the common-law principles discussed earlier.

The Court of Appeals misread *Kelly*. In accordance with the common-law principles incorporated in the statute, *Kelly* simply stands for the proposition that, at a minimum, the aider and abettor is liable for the crime he or she had the intent to commit. Even under the intended offense theory, the defendant's conviction must stand. The intent necessary for second-degree murder is the intent to kill, the *intent to inflict great bodily harm*, or the willful and wanton disregard for whether death will result.[37] In this case, the judge specifically found that defendant intended to inflict great bodily harm, which is sufficient to convict him of second-degree murder.

---

(…continued)
necessary to convict a principal. *People v Mass*, 464 Mich 615, 628; 628 NW2d 540 (2001).

[36] *People v Aaron*, 409 Mich 672, 731; 299 NW2d 304 (1980).

[37] *People v Langworthy*, 416 Mich 630, 650-651; 331 NW2d 171 (1982).

The two approaches outlined above are not in conflict. Instead, they merely represent two different tests for liability under an aiding and abetting theory.[38] Under these two tests, a defendant is liable for the crime the defendant intends to aid or abet[39] as well as the natural and probable consequences of that crime. In this case, the trial court found that defendant intended to inflict great bodily harm.[40] That intent is sufficient for a conviction of aggravated assault or second-degree murder. Alternatively, defendant is liable for the homicide because death is one of the natural and probable consequences of aggravated assault, the crime defendant committed and aided. Either analysis is sufficient to support defendant's conviction.

## CONCLUSION

We hold that a defendant must possess the criminal intent to aid, abet, procure, or counsel the commission of an offense. A defendant is criminally liable for the offenses the defendant specifically intends to aid or abet, or has knowledge of, as well as those crimes that are the natural and probable consequences of the

---

[38] We note that none of the older aiding and abetting cases, such as *Chapman*, has been overruled, and they remain sound law in Michigan.

[39] This includes both intending to commit the crime and aiding someone with knowledge that he or she intends to commit the crime.

[40] We fail to see how Justice Kelly can conclude that we concluded that defendant was aware of or shared Pannell's intent to kill. On the contrary, we have explicitly based our holding on the fact that defendant's intent to inflict great bodily harm is sufficient to maintain his conviction for the resulting death of the victim.

15

offense he intends to aid or abet. Therefore, the prosecutor must prove beyond a reasonable doubt that the defendant aided or abetted the commission of an offense and that the defendant intended to aid the charged offense, knew the principal intended to commit the charged offense, or, alternatively, that the charged offense was a natural and probable consequence of the commission of the intended offense.

Under either prong of the aiding and abetting analysis, defendant was properly convicted. Because the Court of Appeals erred in reversing defendant's conviction of second-degree murder, we reverse the judgment of the Court of Appeals and reinstate defendant's conviction.

Robert P. Young, Jr.
Clifford W. Taylor
Elizabeth A. Weaver
Maura D. Corrigan
Stephen J. Markman

16

S T A T E   O F   M I C H I G A N

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

v                                       No.  126379

KEVIN M. ROBINSON,

      Defendant-Appellee.

CAVANAGH, J. (*dissenting*).

    I agree with the majority's conclusion that under Michigan law, a defendant who intends to aid, abet, counsel, or procure the commission of a crime is liable for *that* crime, as well as the natural and probable consequences of *that* crime.  But the majority's sweeping application of this principle to the facts of this case prevents me from fully embracing this interpretation of MCL 767.39.[1] Specifically, I believe that today's decision sets a dangerous precedent for how

---

[1] MCL 767.39 provides:

    Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense.

MCL 767.39 will be applied in the future, and it stretches aider and abettor liability beyond any defensible bounds. Accordingly, I must respectfully dissent.

In a nutshell, the majority opines that defendant and his codefendant, Samuel Pannell, committed an aggravated assault. Next, the majority posits that "one of" the natural and probable consequences of an aggravated assault is death. Thus, the majority reasons that the trial court properly convicted defendant of second-degree murder, MCL 750.317, under an aiding and abetting theory, MCL 767.39. But, as Justice Kelly notes in her dissent, such an approach completely ignores the trial court's findings of fact.

For example, the trial court specifically found that defendant only intended to beat up the victim. Further, the trial court found that the victim did not die from the beating; rather, the victim died from a gunshot wound after being shot by Pannell. Importantly, the trial court also found that defendant did not intend for or know that Pannell was going to shoot and kill the victim. Therefore, the trial court's findings do not support the imposition of criminal liability for second-degree murder under an aiding and abetting theory based on how MCL 767.39 has been traditionally interpreted. See, e.g., *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999) ("'To support a finding that a defendant aided and abetted a crime, the prosecutor must show that (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) *the defendant intended the commission of the crime or had knowledge that the principal intended*

2

*its commission at the time he gave aid and encouragement.'"*) (emphasis added; citation omitted).

But even under the majority's interpretation of MCL 767.39, these same factual findings do not support a second-degree murder conviction. Here, an evenhanded review of the trial court's findings does not support the conclusion that this death was a natural and probable consequence of this beating because the shooting death was not foreseen and not agreed to. Accordingly, even if I were prepared to accept the majority's interpretation of MCL 767.39, the majority's application of its interpretation defies logic and well-established principles of our criminal law.

For example, the majority's rationale that defendant's second-degree murder conviction was proper because "one of" the natural and probable consequences of a beating is death is akin to saying that defendant's conviction was proper because, in general, a death might be the natural and probable consequence of some abstract beating. However, this rationale utterly destroys one of the most basic principles on which our criminal law is grounded: there can be no criminal liability without individual culpability. See, e.g., *People v Aaron*, 409 Mich 672, 708; 299 NW2d 304 (1980). Accordingly, it does not matter that in some hypothetical sense, a death could result from some beating. What should matter under the majority's interpretation of MCL 767.39 is whether *this* death was the natural and probable consequence of *this* beating. But in this particular case, the trial court answered this question in the negative. Again, it cannot fairly

3

be said that this death was the natural and probable consequence of this beating where the trial court found that the victim did not die from injuries inflicted during the beating, defendant did not intend to kill, and defendant did not know Pannell would shoot and kill the victim. Thus, I disagree with the majority's rationale that because under some circumstances a death *may* result from a beating, defendant's conviction of second-degree murder was proper.

Alternatively, the majority opinion could be read as using the following rationale to reach its result: because a death is *always* the natural and probable consequence of a beating, defendant's conviction of second-degree murder was proper under an aiding and abetting theory. But this rationale likewise destroys the bedrock principle of criminal law that there can be no criminal liability without individual culpability. See *Aaron*, *supra* at 708. Moreover, this rationale is ludicrous because it flies in the face of common experience and knowledge; a death does not *always* result from a beating.

In any event, regardless of whether the majority opinion can be fairly read to employ a "may be" or an "always" rationale, I cannot join today's decision. In my view, the majority's opinion is at odds with the way our law views criminal liability and disregards the trial court's factual findings that the death in this case was not the natural and probable consequence of the assistance defendant provided. In doing so, the majority's application of its interpretation of MCL 767.39 imprudently extends the scope of aider and abettor liability. Here, I believe that defendant's conduct was deplorable and criminal. And I agree with

4

the majority that the facts of this case do not "absolve defendant from his criminal responsibility." *Ante* at 11 n 30. But on the basis of the trial court's actual findings of fact, which are not clearly erroneous, I simply disagree that defendant is criminally responsible for second-degree murder under an aiding and abetting theory.

Additionally, I disagree with the majority's alternative basis for reversing the Court of Appeals judgment and reinstating defendant's conviction of second-degree murder under an aiding and abetting theory merely because defendant was found to have possessed a general intent to cause great bodily harm. For reasons similar to those noted earlier in this opinion, it is insufficient under MCL 767.39 to convict defendant of second-degree murder because "[*o*]*ne of* the potential consequences of causing great bodily harm is that the ultimate result *could be* the death of the victim." *Ante* at 11 n 30 (emphasis added). Moreover, even though defendant was found to have possessed an intent to cause great bodily harm, the trial court's factual findings do not support defendant's conviction of second-degree murder.

Granted, the malice requirement for second-degree murder is satisfied where the defendant has the intent to cause great bodily harm. *People v Goecke*, 457 Mich 442, 463-464; 579 NW2d 868 (1998). But, in light of the trial court's other findings of fact, causation has not been established in this case because the injuries inflicted with the intent to cause great bodily harm were not the cause of death. In other words, it is largely irrelevant that the trial court may have found

5

that defendant generally had the intent to cause great bodily harm and that defendant's actions allowed Pannell to ultimately get the upper hand because the trial court also found that the assault with intent to cause great bodily harm did not result in injuries that caused death. As such, the trial court's latter finding fails to make the necessary criminal connection between the intent to cause great bodily harm and an act that effectuated that intent *and* caused the death. Again, I believe that defendant's conduct was deplorable and criminal. But the trial court's findings of fact are not clearly erroneous and, thus, require that defendant's second-degree murder conviction under an aiding and abetting theory be reversed. Thus, I disagree with the majority's alternative basis for reversing the Court of Appeals judgment as well.

In sum, because this death was not the natural and probable consequence of this beating and defendant's intent and actions did not criminally cause this death, defendant cannot be convicted of second-degree murder under an aiding and abetting theory. Therefore, I would affirm the judgment of the Court of Appeals.

Michael F. Cavanagh

6

S T A T E   O F   M I C H I G A N

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

v                                   No.  126379

KEVIN M. ROBINSON,

      Defendant-Appellee.

_____

KELLY, J. (*dissenting*).

With this decision, the majority improperly extends the reach of Michigan's aiding and abetting statute, MCL 767.39. It will now include a rationale for finding criminal liability without the requisite element of intent.

I agree with the Court of Appeals decision in this case. A defendant cannot be convicted of second-degree murder under an aiding and abetting theory where the defendant did not intend the act that causes the death. In this case, defendant Robinson intended only to beat the victim, and the beating was not the cause of death. In order to convict Robinson of aiding and abetting murder, the majority must append language to the statute.

It currently states:

Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction

shall be punished as if he had directly committed such offense. [MCL 767.39.]

The majority effectively adds to it the phrase "as well as the natural and probable consequences of any such crime." Reading language into a statute to reach a result not intended by the Legislature is an abuse of this Court's power.

PROPER STANDARD FOR REVIEW OF FACTS

I concur in the majority opinion's "Facts and Procedural History" except to the extent that it picks and chooses among the trial court's findings of fact relating to evidence of defendant's intent. There was no evidence establishing that Robinson was aware of or shared codefendant Pannell's intent to kill. Instead, the trial court's findings support only a conviction of assault with intent to do great bodily harm less than murder. MCL 750.84.

In fact, the trial judge's findings actually preclude Robinson's conviction of second-degree murder. One of the judge's most pertinent determinations was that Robinson did not share or know of Pannell's intent to kill. In its 18-page opinion, the Court of Appeals thoroughly reviewed the judge's factual findings and correctly held that Robinson had been improperly convicted of second-degree murder. It observed:

> The judge's factual findings that
>
> • Robinson "agreed" and "understood" he was "only there to beat up" the victim, and
>
> • the shooting "was beyond the scope of what [Robinson] had intended to have happen; and

2

> • Robinson intended to inflict great bodily harm <u>only</u>,
>
> require that his conviction of second-degree murder, as an aider and abettor, be reversed.
>
> * * *
>
> The judge did not recognize that since the death of the victim did not result from injuries inflicted during the physical assault committed by Robinson with the intent to inflict great bodily harm only, Robinson could not be found guilty of second-degree murder because the victim of the physical assault [as the judge put it] "happened to die." Robinson could properly he [sic] convicted of second-degree murder as an aider and abettor only if he provided aid to Pannell in killing the victim with the intent to so aid Pannell in killing the victim, sharing or aware of Pannel's intent to kill. [*People v Robinson*, unpublished opinion per curiam of the Court of Appeals, issued April 29, 2004 (Docket No. 237036), slip op at 8, 14 (emphasis in original).]

This Court, like the Court of Appeals, should defer to the trial court's findings of fact, setting them aside only if they are clearly erroneous.

As the Court of Appeals observed, "Another finder of fact, a jury or another judge, might have assessed Robinson's credibility and the other evidence differently [finding sufficient evidence to support a conviction of second-degree murder]." *Id.*, slip op at 4. But this judge did not. The trial court's factual determinations simply do not include the necessary element of shared or known intent to support a second-degree murder conviction using an aiding and abetting theory.

3

Facts are indeed "stubborn things,"[1] and we are not the finders of fact here. Like the Court of Appeals, we normally apply the law only to the facts as found by the trial court. The rule is that those findings may not be set aside unless they are clearly erroneous. MCR 2.613(C). Thus, this Court's review of the factual record is limited. But the majority in this case is not following the rule.

### "NATURAL AND PROBABLE CONSEQUENCES" CANNOT SUBSTITUTE FOR REQUISITE INTENT UNDER AN AIDING AND ABETTING THEORY OF PROSECUTION

As the majority correctly points out, aiding and abetting is not a separate substantive offense. It is simply a theory of prosecution that permits imposing vicarious liability on accomplices if they share or have knowledge of the principal's intent.[2]

The majority asserts that "evidence of a shared specific intent to commit the crime of an accomplice is [not] the exclusive way to establish liability under our

---

[1] "Facts are stubborn things; and whatever may be our wishes, our inclinations, or the dictates of our passion, they cannot alter the state of facts and evidence." John Adams, "Argument in Defense of the Soldiers in the Boston Massacre Trials," December 1770, quoted at The Quotations Page, <http://www.quotationspage.com/quote/3235.html> (accessed April 19, 2006).

[2] See *People v Aaron*, 409 Mich 672; 299 NW2d 304 (1980), in which this Court abrogated the common-law felony-murder doctrine. That doctrine had allowed the element of malice required for murder to be satisfied by the intent to commit the underlying felony. The Court held "that in order to convict a defendant of murder, . . . it must be shown that he acted with intent to kill or to inflict great bodily harm or with a wanton and willful disregard of the likelihood that the natural tendency of his behavior is to cause death or great bodily harm." The Court further held "that the issue of malice must always be submitted to the jury." *Id.* at 733.

4

aiding and abetting statute." *Ante* at 5. The majority argues an alternative theory of culpability that extends criminal liability beyond the "natural and probable consequences" of the crime a person aids or abets. As Justice Cavanagh notes in his dissent, what matters here, even under the majority's rationale, "is whether *this* death was the natural and probable consequence of *this* beating." *Ante* at 3 (emphasis in original). Instead, the majority would have the death by gunshot flow naturally from the beating, contrary to the trial judge's specific finding that Robinson intended to inflict great bodily harm alone.[3]

The defendant in *People v Knapp*[4] was granted a new trial because the victim's death was not "part of the 'common enterprise' of prostitution because one would not expect death 'to happen if the occasion should arise to [throw the victim out a window].'"[5] *Ante* at 9, quoting *Knapp*, *supra* at 115. However, the "common enterprise" was a core issue in *Knapp*. In fact, the prosecuted "common enterprise" in *Knapp* was rape and murder, not prostitution.

> The evidence for the prosecution tends to show that the deceased was, before the accident, in the upper story of a building belonging to defendant, and used as a paint shop, in Howell, in company with him and several other young men, and that *they had*

---

[3] I can find no authority for the proposition that a defendant can be held liable for all the potential or hypothetical results of an intended act. See the Court of Appeals example on page 9 of my opinion.

[4] 26 Mich 112 (1872).

[5] In *Knapp*, the victim fell or was thrown from an upper story window. She broke her leg and died as a result of that injury.

*sexual intercourse with her; and this was claimed by the prosecution to have been forcible, and against her will, and that she had been forcibly taken there for that purpose.* [*Id*. at 113 (emphasis added).]

The defense claimed that there was no common purpose or offense at all. Rather, the death "was either accidental, or caused by some act in which [the defendant] had no part." *Id*. at 114.

> The conviction of manslaughter could only have been under certain portions of the [trial court's] charge, permitting the jury to find it in case the injury was caused in an attempt of the various persons assembled in the paint shop to avoid arrest. [*Id*.]

The jury was able to find the defendant guilty of manslaughter because the court's charge allowed it to find that he, along with the others, was "'engaged in an act against public morals, and unlawful.'" *Id*. at 115. And, that "'in order to avoid arrest or exposure, [they] threw her out of the window . . . .'" *Id*.

On appeal, this Court did not approve of the trial court's charge to the jury:

> *The effect of these rulings was practically to hold that parties who have combined in a wrong purpose must be presumed*, not only to combine in some way in escaping arrest, but also *to be so far bound to each other as to be responsible severally for every act done by any of them* during the escape.
>
> *It is impossible to maintain such a doctrine.* It is undoubtedly possible for parties to combine in order to make an escape effectual, but no such agreement can lawfully be inferred from a combination to do the original wrong. *There can be no criminal responsibility for anything not fairly within the common enterprise, and which might be expected to happen if occasion should arise for anyone to do it.* [*Id*. (emphasis added).]

In the case at hand, the trial court found that the common enterprise was to beat the victim. There was no common enterprise to kill the victim. Robinson went along "only to beat up" the victim. *Robinson, supra,* slip op at 8, 11, and 13.

6

In Robinson's words, "it was understood between us that we were going to f\*\*\* him up." As a practical matter, f\*\*\*ing up someone necessarily entails leaving them alive. In the context of this case,[6] it most likely means to "put [the victim] in an extremely difficult or impossible situation."[7] Offensive as the word is, it is not used to mean "to kill." We have many other slang words that mean "to kill," such as "bump off," "ice," "knock off," "waste," "rub out," and "whack." Applying the trial judge's factual findings, it is clear that Robinson agreed to harm the victim, not to kill him.

The majority cites *People v Chapman*,[8] in which this Court held that a defendant is "'responsible criminally for what of wrong flows directly from his corrupt intentions . . . .'" See *ante* at 9-10. The more complete citation contained in *Chapman* is:

---

[6] In its footnote 29, the majority mistakenly cites me as stating that the word cannot, "in any context, be used to mean actions that are likely to result in a killing." *Ante* at 11. In fact, I am discussing the word "in the context of this case."

[7] Apart from its first two definitions as an obscene or extremely vulgar verb for sexual intercourse, the word "f\*\*\*" also means "3. . . . To put in an extremely difficult or impossible situation. . . . 4. . . . To break or destroy. . . . 5. . . .To defraud. . . 6. . . . To play with, to tinker. <http://en.wiktionary.org/wiki/f\*\*\*> (accessed April 19, 2006). And "2. to treat unfairly or harshly," *Random House Webster's College Dictionary* (2001), or "2. damage or ruin," *Oxford Color Dictionary* (2d ed). When used synonymously with "destroy" and "damage," the reference normally is to a physical object, not to a person.

[8] 62 Mich 280, 286; 28 NW 896 (1886) (citation omitted).

"Every man is responsible criminally for what of wrong flows directly from his corrupt intentions; *but no man intending wrong is responsible for an independent act of wrong committed by another.* If one person sets in motion the physical power of another person, the former is criminally guilty for its results. *If he contemplated the result, he is answerable,* though it is produced in a manner he did not contemplate." [*Id. at* 286, quoting 1 Bishop, Criminal Law (7th ed) (emphasis added).]

In this case, the trial court specifically found that Robinson did not intend or contemplate the result, Pannell's fatal shooting of the victim. Because Robinson did not share Pannell's intent to kill, he cannot be held answerable under the law for the fact that Pannell fatally shot the victim. The common enterprise was a beating. The fact that Pannell shot the victim, rather than beat him to death, is dispositive.

The framework established by *Knapp* and *Chapman* continues to be sound law. It simply does not support the majority's conclusion that the victim's death in this case is "clearly within the common enterprise the defendant aided because a homicide 'might be expected to happen if the occasion should arise' within the common enterprise of committing an aggravated assault." *Ante* at 10.

The victim's death here was not within Robinson and Pannell's common enterprise; a homicide by gun is not a natural and probable consequence of an intended assault and battery. The majority is mistaken in concluding otherwise. It

8

errs by determining that the unintended result of an intentional act was a "natural and probable consequence" for which a defendant may be held criminally liable.[9]

As the Court of Appeals explained in the following example, a defendant must share or have knowledge of the principal's criminal intent.

> Suppose two persons are walking to the bank, and one asks the other to carry his briefcase. And, after they arrive at the bank, the owner of the briefcase opens it and holds up the bank. His friend no doubt provided aid and assistance in holding up the bank, by accompanying the thief and carrying the briefcase, but is not subject to liability as an aider and abettor unless he provided the assistance with the intention of so assisting the owner of the briefcase in holding up the bank, while either sharing or aware of his criminal intent. [*Robinson, supra*, slip op at 12-13.]

An aider and abettor must have the same criminal intent as the principal. The majority incorrectly faults the Court of Appeals discussion of *People v Kelly*[10] on this point.[11] The Court of Appeals reliance on *Kelly* is not misplaced. The *Kelly* Court wrote:

---

[9] The majority states, "In our judgment, a natural and probable consequence of a plan to assault someone is that one of the actors may well escalate the assault into a murder." *Ante* at 11. In this case, the majority believes that "[a] 'natural and probable consequence' of leaving the enraged Pannell alone with the victim is that Pannell would ultimately murder the victim." *Ante* at 12.

[10] 423 Mich 261; 378 NW2d 365 (1985).

[11] Justice Levin concurred in the result reached in *Kelly* on the aiding and abetting issue because no objection to the instruction of the trial court was raised. However, he dissented with regard to the felony-murder issue. The judge incorrectly instructed the jury, over objection by the defense, that it might infer from the defendant's participation in the robbery that he had the requisite intent to murder.

(continued…)

9

In *People v Aaron*, 409 Mich 672, 728; 299 NW2d 304 (1980), this Court held that

"malice is the intention to kill, the intention to do great bodily harm, or the wanton and willful disregard of the likelihood that the natural tendency of defendant's behavior is to cause death or great bodily harm. We further hold that malice is an essential element of any murder . . . whether the murder occurs in the course of a felony or otherwise."

We therefore decided that the malice necessary for a felony-murder conviction could not be inferred *merely* from the intent to commit the underlying felony. However, we went on to state:

"The facts and circumstances involved in the perpetration of a felony *may* evidence an intent to kill, an intent to cause great bodily harm, or a wanton and willful disregard of the likelihood that the natural tendency of defendant's behavior is to cause death or great bodily harm; however, the conclusion must be left to the jury to infer from all the evidence. [Emphasis added. *Id*., pp 728-729.]" [*Kelly, supra* at 272-273.]

The finder of fact here concluded that defendant did not have the requisite intent to kill the victim. Absent proof of the requisite intent, defendant's conviction of second-degree murder must be reversed.

CONCLUSION

I agree with and completely support the Court of Appeals opinion in this matter. I would affirm the panel's decision to reverse Robinson's conviction of second-degree murder. I would reduce the charge of which Robinson was

---

(…continued)

Retired Justice Levin sat on the Court of Appeals panel in *Robinson*, this case.

convicted to assault with intent to do great bodily harm less than murder and remand for resentencing on that reduced charge.

Marilyn Kelly